UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

AUBREY S. MURRAY,                    )
                                      )
            Plaintiff,                )
                                      )
v.                                    )       No.:   2:21-CV-123-TAV-CRW
                                      )
CITY OF ELIZABETHTON, TENNESSEE; )
DANIEL ESTES,                         )
in his individual capacity; and       )
BARRY CARRIER,                        )
in his individual capacity,           )
                                      )
            Defendants.               )


## <u>MEMORANDUM OPINION AND ORDER</u>

This civil matter is before the Court on defendant City of Elizabethton, Tennessee's

Motion to Dismiss [Doc. 25] and defendants Daniel Estes and Barry Carrier's Alternative

Motion to Dismiss and/or for Summary Judgment [Doc. 27]. Elizabethton moves the Court

to dismiss plaintiff's First Amended Complaint [Doc. 24] under Federal Rule of Civil

Procedure 12(b)(6) for failure to state a claim upon which relief can be granted [Doc. 25,

p. 1]. Estes and Carrier adopt Elizabethton's motion and move, in the alternative, for

summary judgment pursuant to Federal Rule of Civil Procedure 56 based on the defense

of qualified immunity [Doc. 27; Doc. 28, p. 2].

The parties have filed their respective responses and replies to these motions

[Docs. 36, 37, 40, 41]. The motions are therefore ripe. *See* E.D. Tenn. L.R. 7.1(a), 7.2.

For the reasons explained below, Elizabethton's motion [Doc. 25] is **GRANTED in part**

**and DENIED in part**, and Estes and Carrier's motion [Doc. 27] is **GRANTED in part and DENIED in part**. The parties' Joint Motion to Stay [Doc. 43], which requests the Court stay the case pending ruling on the motions, is accordingly **DENIED as moot**.

## I.    Background[1]

Plaintiff was employed as Deputy Chief of Elizabethton's fire department for over two and a half years [Doc. 24 ¶ 7]. His employment with Elizabethton began in 1993, and he was consistently employed in various positions within the fire department until he was constructively discharged [*Id.*]. Plaintiff has a mentally disabled adult son named Austin Murray ("Austin"), who was employed as a janitor by Elizabethton's school system at Elizabethton High School [*Id.* ¶ 8]. Plaintiff is married to Amy Murray ("Amy") [*Id.* ¶ 9].

In early December 2020, plaintiff attended a meeting at the Carter County Health Department where various state and local officials met to discuss having a mass COVID-19 vaccination event for eligible individuals in Carter County, Tennessee [*Id.* ¶ 10]. During this meeting, it was decided that Elizabethton and Carter County agencies would submit lists of individuals eligible to receive the COVID-19 vaccine so that these individuals could receive their vaccinations during the mass vaccination event being planning in Carter County [*Id.* ¶ 11]. Two officials from the Tennessee Department of Health ("TDH") attended this meeting [*Id.* ¶ 12].

---

[1] For purposes of the portion of this opinion addressing Elizabethton's motion to dismiss [Doc. 25], the Court accepts all factual allegations in plaintiff's Amended Complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

2

After the meeting concluded, plaintiff went outside and began talking with acquaintances, including one of the individuals who works for the TDH [*Id.* ¶ 13]. He asked this individual when school employees would likely be able to receive their vaccines. She responded that she did not know the date and then asked why plaintiff wanted to know this information. Plaintiff explained that his adult son was disabled and worked at one of the local schools [*Id.*]. After learning this information, the TDH representative told plaintiff that his son needed the COVID-19 vaccine and to add him to the Elizabethton fire department's list of people eligible to receive the vaccine at the upcoming mass vaccination event [*Id.* ¶ 14]. Plaintiff advised the representative that he could not and would not place his son on the fire department's list [*Id.* ¶ 15].

The now former Assistant Director of the Carter County Emergency Medical Services ("CCEMS") was also participating in the conversation [*Id.* ¶ 16]. This individual volunteered to place Austin on CCEMS's list of people eligible to receive the COVID-19 vaccination. Plaintiff did not ask this individual to do this, nor did he use his position to persuade the individual to add Austin to the agency's list [*Id.*].

Plaintiff's wife Amy has never been employed by the CCEMS, but she has volunteered for the agency for approximately four years [*Id.* ¶ 17]. Without plaintiff's knowledge, CCEMS added Amy to its list of people eligible to receive the COVID-19 vaccine at the upcoming mass vaccination event [*Id.* ¶ 18]. Plaintiff did not ask anyone to add his wife to the CCEMS list, nor did he use his position to persuade anyone associated with CCEMS to add his wife to the organization's list [*Id.* ¶ 19]. Amy received her

3

vaccination at the mass vaccination event on December 22, 2020 [*Id.* ¶ 20]. Prior to receiving his COVID-19 vaccination, plaintiff's son received a message advising that Elizabethton's school system employees were eligible to receive their COVID-19 vaccinations [*Id.* ¶ 21]. After learning this information, Austin received his COVID-19 vaccination at the mass vaccination event on December 23, 2020 [*Id.* ¶ 22].

In late January or early February 2021, Fire Department Battalion Chief Andy Wetzel came into plaintiff's office with Fire Marshal Andy Hardin and told him that people were talking about his son and wife receiving their COVID-19 vaccinations [*Id.* ¶ 23]. They accused plaintiff of improperly using his position as Deputy Fire Chief to get his wife and son vaccinated. Upset by their accusations, plaintiff requested that Fire Chief Carrier be called [*Id.*].

Plaintiff explained to Carrier that he had never requested that Amy or Austin be added to any list for their COVID-19 vaccines [*Id.* ¶ 24]. He further explained that the now former Assistant Director of the CCEMS volunteered to add Austin to the CCEMS's list of people eligible to receive the vaccine and that Austin was eligible to receive the vaccine as an employee of Elizabethton's school system on December 23, 2020. In addition, plaintiff told Carrier that he had no knowledge that Amy had been placed on CCEMS's list. Plaintiff adamantly denied using his position to obtain COVID-19 vaccinations for either Amy or Austin [*Id.*]. Carrier told Wetzel that he would investigate the situation [*Id.* ¶ 25].

4

Approximately 10 days later, Carrier told plaintiff that a meeting had been scheduled at City Hall to discuss the vaccination issue [*Id.* ¶ 26]. Elizabethton's Human Resources Director Angie Lyons, Carrier, City Manager Estes, and plaintiff attended this meeting [*Id.*]. During the meeting, Lyons, Carrier, and Estes asked plaintiff how his wife and son had come to be vaccinated against COVID-19 [*Id.* ¶ 27]. Plaintiff explained that unbeknownst to him, CCEMS had placed his wife on its list of eligible individuals and his son was eligible to receive a vaccination because he was an employee of Elizabethton's school system. Plaintiff denied using his position to obtain their vaccinations [*Id.*].

About one week later, Carrier passed by plaintiff's desk and engaged plaintiff in conversation about the vaccination issue [*Id.* ¶ 28]. Plaintiff told Carrier that he could not understand why Carrier, Estes, and Lyons were upset with him when he had not done anything wrong. He also criticized defendants'[2] investigation into his alleged wrongdoings, given that defendants could simply confirm with CCEMS and/or Elizabethton's school system that Amy and Austin had been vaccinated with no input or influence from him [*Id.*].

On February 22, 2021, Carrier advised plaintiff that another meeting had been set for that day at City Hall [*Id.* ¶ 30]. Carrier, Estes, Lyons, and plaintiff attended this meeting [*Id.*]. When plaintiff arrived at the meeting, Estes asked him how things were going at the fire department, and plaintiff told him that things were going fine [*Id.* ¶ 31]. Estes then said, "No, they're not," and asked whether plaintiff had anything to tell him [*Id.*]. Plaintiff

---

[2] "Defendants" refers to Elizabethton, Estes, and Carrier, collectively.

advised Estes that he did not have anything to tell him. Estes then began accusing plaintiff of blackmailing Carrier [*Id.* ¶ 32]. Plaintiff adamantly denied making the alleged threat or blackmailing Carrier [*Id.*].

Estes and Lyons then began having a discussion between themselves about retirement rates, referencing the "1.575 percent" and "the other way – one percent" [*Id.* ¶ 34]. As an employee of the fire department, plaintiff knew that he received 1.575 percent of his average annual salary for his five highest-paid years of employment toward retirement for every year that he worked for the fire department [*Id.* ¶ 35]. He also knew that employees who are terminated receive just one percent of their annual salary for their five highest-paid years of employment toward retirement for every year worked [*Id.*]. When Estes and Lyons began discussing the 1.575 percent retirement rate and "the other way – one percent," plaintiff realized they were discussing terminating him from the fire department [*Id.* ¶ 36]. Estes then told plaintiff that their offer to him was that he could work until April 22, 2021, and that he could then take vacation time and comp time until July 31, 2021, at which point he could retire [*Id.* ¶ 37]. Furthermore, Estes told plaintiff that he would no longer be allowed to work as Deputy Fire Chief during this time and that he would be demoted to Fire Marshal [*Id.*]. The position of Fire Marshal pays more than one thousand dollars per month less than Deputy Chief [*Id.* ¶ 38].

Because plaintiff heard Estes and Lyons discussing the 1.575 percent retirement rate and "the other way – one percent" rate, plaintiff knew that if he did not accept defendants' "offer," he would be terminated and would lose a substantial portion of his retirement

6

benefits [*Id.* ¶ 39]. Plaintiff had not determined in February 2021 that he wanted to retire effective August 1, 2021 [*Id.* ¶ 40]. However, he was forced to do so or be immediately terminated and lose a significant amount of his retirement benefits [*Id.*]. In addition, had he not retired, plaintiff could have continued accruing money toward his retirement [*Id.* ¶ 41]. Furthermore, the amount of money that plaintiff earned toward retirement during his last months of his employment with the fire department was significantly less because of his demotion [*Id.* ¶ 42].

Plaintiff's goal throughout his employment had been to save enough money toward his retirement so that when he retired, he could choose the retirement plan that afforded him the option of taking a reduced retirement payment each month until his death, at which point his designated beneficiary would receive the same payment each month until his death [*Id.* ¶ 43]. Plaintiff had planned to designate Austin as his beneficiary [*Id.*]. However, because he was forced to retire early, plaintiff was not able to choose this option and instead, was forced to choose the option of receiving the full retirement payment each month in order to pay his bills [*Id.* ¶ 44].

Plaintiff filed this action on August 17, 2021, against Elizabethton, Estes, and Carrier [Doc. 1]. In the Amended Complaint, plaintiff alleges that under the First and Fourteenth Amendments to the Constitution, defendants' actions violated his freedom of speech, expressive association, and association with close family members [Doc. 24 ¶¶ 45–50]. In addition, plaintiff alleges that defendants retaliated against him and interfered with his legally protected wages and benefits in violation of 29 U.S.C. § 1140

7

[*Id.* ¶ 51].  Furthermore, plaintiff alleges that Elizabethton's actions, alone, constituted common law retaliatory discharge [*Id.* ¶ 52].  Plaintiff seeks as relief compensatory damages, punitive damages, court costs, and attorney's fees [*Id.* at 10].

## II.     Elizabethton's Motion to Dismiss

### A.     Standard of Review

Rule 8(a)(2) sets out a liberal pleading standard.  *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 n.1 (6th Cir. 2004).  Thus, a complaint filed in federal court need only contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the [opposing party] fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Detailed factual allegations are not required, but a party's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions."  *Twombly*, 550 U.S. at 555.  "'[A] formulaic recitation of the elements of a cause of action will not do'"; nor will "an unadorned, the-defendant-unlawfully-harmed-me accusation"; nor will "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (second alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

In deciding a Rule 12(b)(6) motion, the Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *accord Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court

8

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will [ultimately] . . . be a context-specific task that requires [the Court] to draw on its judicial experience and common sense." *Id.* at 679. In conducting this inquiry, the Court "must construe the complaint in a light most favorable to plaintiff[], accept all well-pled factual allegations as true, and determine whether plaintiff[] undoubtedly can prove no set of facts in support of those allegations that would entitle [him] to relief." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008).

### B.     Analysis

#### 1.     Judicial Notice

Before addressing plaintiff's claims, the Court must first address Elizabethton's request that the Court take judicial notice of its City Ordinance containing its Ethics Policy [Doc. 25, pp. 1–2; Doc. 26-1]. In support, it states that public records can be referenced in support of a Rule 12(b)(6) motion without converting the motion to one for summary judgment, citing to *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) [Doc. 26, p. 4 n.1]. While plaintiff has referenced Elizabethton's use of the Ethics Policy in its arguments, plaintiff has not stated a position as to the issue of judicial notice [Doc. 36, p. 14].

"[A] court ruling on a motion to dismiss *may* consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice." *Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017) (internal

9

quotation marks omitted). The Sixth Circuit has found that municipal ordinances are appropriate for judicial notice. *See United States v. Alexander*, 467 F. App'x 355, 360 (6th Cir. 2012) (quoting *Tollis, Inc. v. Cnty. of San Diego*, 505 F.3d 935, 938 n.1 (9th Cir. 2007)). As a result, and in the absence of any opposition, the Court will take judicial notice of Elizabethton's City Ordinance containing its Ethics Policy [Doc. 26-1].

## 2. First Amendment: Freedom of Speech and Expressive Association

Elizabethton argues that plaintiff has failed to state a claim of retaliatory/constructive discharge in violation of his First Amendment rights [Doc. 26, p. 4]. Addressing the Sixth Circuit's factors for determining whether a public employee's speech is constitutionally protected and whether the speech was made solely up the chain of command, Elizabethton contends that the purpose of plaintiff's speech was to respond to accusations or questions regarding his conduct as Deputy Fire Chief, including potential ethics violations stemming from his wife and son obtaining the COVID-19 vaccine and potential threats made to Carrier [Doc. 26, pp. 6–8]. As to the setting of the speech, Elizabethton states that the location of plaintiff's speech was confined to the fire department or Estes's office [*Id.* at 8–9]. As to the speech's audience, Elizabethton maintains that plaintiff's speech was directed to Carrier, Estes, and Lyons [*Id.* at 9]. As to the general subject matter, Elizabethton asserts that plaintiff's conduct involved issues that arose within the course and scope of his official duties. Elizabethton argues that application of these factors demonstrates that plaintiff's speech was a matter of private interest and not protected by the First Amendment. Elizabethton contends that

10

plaintiff's speech was made entirely up the chain of command, and therefore, his First Amendment claim should be dismissed [*Id.*].

Moreover, Elizabethton points to various allegations throughout plaintiff's Amended Complaint that demonstrate that his speech was made in response to accusations against him for actions taken in his position as Deputy Fire Chief [*Id.* at 9–10]. Elizabethton further submits that the truth or falsity of the accusations against plaintiff are of no consequence to the classification of his speech [*Id.* at 10]. Elizabethton states that plaintiff's allegations, taken as true, show that his speech concerned an employment investigation into his conduct and his response to the investigation. Because plaintiff does not and cannot claim his speech was made as a private citizen, Elizabethton asserts that the First Amendment is inapplicable and does not serve to protect his speech [*Id.*]. Furthermore, Elizabethton argues that plaintiff's speech was not a matter of public concern. Instead, it contends that plaintiff's allegations reflect an employment grievance concerning matters of personal interest, specifically, Elizabethton declining to accept his contention that he was being falsely accused [*Id.* at 11].

Plaintiff responds that he has set forth a plausible retaliatory discharge claim under the First Amendment [Doc. 36, p. 3]. Plaintiff first cites to Tenn. Code Ann. § 6-21-702 and contends that criticizing an investigation into allegedly wrongfully obtained COVID-19 vaccinations is not listed as an official duty for members of the fire department [*Id.* at 7]. He argues that the critical question is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those

11

duties. He asserts that speech that merely concerns those duties does not fall within the scope of an employee's duties [*Id.*].

In addition, plaintiff argues that the same factors Elizabethton cites to weigh in his favor [*Id.*]. As to the impetus for the speech, plaintiff states that Elizabethton has failed to address the speech at the center of this claim: plaintiff's criticism of the handling of a COVID-19-related investigation by the fire department [*Id.* at 7–8]. As to the setting of the speech, plaintiff agrees that the location of his speech was confined to the fire department or Estes's office [*Id.* at 8]. As to the speech's audience, plaintiff also agrees that his speech was directed to Carrier, Estes, and Lyons [*Id.*]. However, plaintiff argues that because his duties did not involve reporting investigatory inefficiencies and/or potential misconduct and because Lyons was an individual outside the fire department's chain of command, the speech's audience weighs in plaintiff's favor [*Id.* at 8–9]. As to the general subject matter, plaintiff states that although he denies any wrongdoing relating to his wife and son's COVID-19 vaccinations, defendants retaliated against him and forced him to retire because he criticized the way the fire department was handling a COVID-19-related investigation [*Id.* at 9]. Plaintiff asserts that it was this criticism that was the general subject matter of the speech at issue, and it was not within the scope of his duties as Deputy Fire Chief [*Id.*].

Moreover, plaintiff argues that his speech involved a matter of public concern [*Id.*]. He cites to numerous cases to demonstrate that the COVID-19 pandemic is a matter of public concern [*Id.* at 10]. Plaintiff maintains that he criticized the fire department's

12

investigation into allegedly wrongfully-obtained COVID-19 vaccinations, which was a matter of public concern as the public had a strong interest in ensuring that those qualified to receive their vaccinations received them and that investigations into allegedly wrongfully-obtained vaccinations were properly conducted [*Id.* at 10–11].

Furthermore, plaintiff contends that his interest as a citizen in speaking on the matter outweighed Elizabethton's interest, as an employer, in promoting the efficiency of the public services it performs through its employees [*Id.* at 11]. Plaintiff argues, though, that because Elizabethton has not addressed this factor of his claim, it should be waived [*Id.*]. Plaintiff contends that he has set forth the remaining elements of a prima facie case of First Amendment retaliation [*Id.* at 11–12].

Elizabethton replies that plaintiff is sidestepping a significant and relevant consideration that includes whether a plaintiff's statements were only made to individuals up the chain of command [Doc. 40, p. 2]. In addition, Elizabethton contends that the allegations made in the Amended Complaint demonstrate that plaintiff's speech is nothing more than "quintessential employee beef: management has acted incompetently.". Elizabethton further argues that plaintiff has made no allegation that his speech took place outside of the workplace or within a public forum [*Id.*]. Moreover, Elizabethton states that by communicating his opinion as to the inadequacy of the investigation into his misconduct, plaintiff was not bringing to light or exposing any matter beyond the confines of the room where he was being questioned about his potential workplace misconduct. Furthermore, Elizabethton maintains that while the COVID-19 pandemic is a clear and

present danger to society, plaintiff was not in a public arena expressing his views about the concern with the COVID-19 pandemic or the danger it presented to society [*Id.* at 3]. Instead, Elizabethton contends that he was simply attempting to avoid disciplinary action with respect to an inquiry into whether he had improperly utilized his position to obtain a benefit for his family members to which they would not otherwise have been entitled [*Id.*].

In order to state a claim for retaliation under the First Amendment, a plaintiff must show:

> (1) that []he was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 492 (6th Cir. 2006) (internal quotation marks omitted). As to the first prong, a plaintiff must show:

> (1) that h[is] speech was made as a private citizen, rather than pursuant to h[is] official duties; (2) that h[is] speech involved a matter of public concern; and (3) that h[is] interest as a citizen in speaking on the matter outweighed the state's interest, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012) (internal quotation marks omitted).

In determining whether a plaintiff's speech was made as a private citizen, the Supreme Court has stated that the critical question is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). As a result, "speech [that] concerns

14

information acquired by virtue of [an employee's] public employment does not transform that speech into employee—rather than citizen—speech." *Id.*

The Sixth Circuit has identified several factors to assist courts with this determination, including "the impetus for [the] speech, the setting of [the] speech, the speech's audience, and its general subject matter." *Handy-Clay*, 695 F.3d at 540 (internal quotation marks omitted). "Relevant considerations include whether the statements were made to individuals up the chain of command . . . and whether the content of the speech is nothing more than the quintessential employee beef: management has acted incompetently." *Id.* (internal citations and quotation marks omitted). Moreover, "[f]actors that may be relevant but are not dispositive include whether the speech was made inside or outside of the workplace and whether it concerned the subject-matter of the speaker's employment." *Id.*

Here, the parties do not dispute that the setting of the speech was largely confined to the fire department and Estes's office [Doc. 26, pp. 8–9; Doc. 36, p. 8]. In addition, the Amended Complaint alleges that the two meetings between Carrier, Estes, Lyons, and plaintiff took place at City Hall [Doc. 24, ¶¶ 26, 30]. "On-the-clock speech at the employer's place of business is more likely to be speech as a government agent as compared to off-the-clock speech away from the office." *DeCrane v. Eckart*, 12 F.4th 586, 596 (6th Cir. 2021). Nonetheless, because some of plaintiff's speech took place at City Hall and was not exclusively confined to the fire department, this factor weighs slightly in favor of plaintiff's speech being made as a private citizen.

15

The parties also do not dispute that the speech's audience was Carrier, Estes, and Lyons [Doc. 26, p. 9; Doc. 36, p. 8]. However, the parties do dispute whether this audience demonstrates that plaintiff's speech was made entirely up the chain of command. Plaintiff argues that because it was not within his duties to report investigatory inefficiencies and/or potential misconduct and because he reported the information to Lyons, his speech was outside the chain of command [Doc. 36, pp. 8–9]. On the other hand, Elizabethton argues plaintiff's speech was made entirely up the chain of command [Doc. 26, p. 9].

The Court agrees that it was not within plaintiff's job description to report investigatory inefficiencies or potential misconduct. In fact, plaintiff has cited to Tenn. Code Ann. § 6-21-702, which states, "It is the duty of the chief of the fire department and the members thereof to take all proper steps for fire prevention and suppression." Nothing in this statute indicates plaintiff's job duties included reporting inefficiencies or misconduct, and Elizabethton has not pointed to anything that states otherwise. *Cf. Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (where the plaintiff spoke "as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case"). Elizabethton has attached its Ethics Policy to its motion, of which the Court has taken judicial notice, but Elizabethton has not argued that the policy requires all employees to report violations by virtue of the Ethics Policy. *Cf. Mayhew v. Town of Smyrna*, 856 F.3d 456, 465 (6th Cir. 2007) (finding that reporting any appropriate situations and accidents was included in the context of all city regulations). Thus, this factor weighs in favor of finding plaintiff's speech was made as a private citizen.

16

Moreover, the Court does not find that plaintiff's speech was made entirely up the chain of command. Instead, while plaintiff has not alleged that he voiced his concerns publicly, he has alleged that he "spoke to a broader audience than h[is] immediate supervisor[.]" *Howard v. Livingston Cnty.*, No. 21-1689, 2023 WL 334894, at *8 (6th Cir. Jan. 20, 2023). Not only does plaintiff allege that he spoke with Carrier, but he also spoke to Estes, the City Manager, and Lyons, Elizabethton's Human Resources Director [Doc. 24, ¶¶ 26–33]. This audience is distinguishable from *Mayhew*, 856 F.3d at 460, 465, where the plaintiff admitted to only reporting up the chain of command, and is more akin to *Handy-Clay*, 695 F.3d at 542, where the plaintiff spoke to "an individual in the city payroll department, a human resources employee, and a city councilman," and *Howard*, 2023 WL 334894, at *8, where the plaintiff spoke to people "who were not her supervisors[.]" As a result, plaintiff has sufficiently pled that his speech was not made entirely up the chain up command, and this factor also weighs in favor of finding that his speech was made as a private citizen.[3]

The parties disagree as to the impetus for the speech and the general subject matter of the speech. Elizabethton contends that the purpose of plaintiff's speech was to respond to accusations or questions regarding alleged ethics violations [Doc. 26, p. 8]. Elizabethton

---

[3] Elizabethton cites to several cases for the proposition that plaintiff's speech was made entirely up the chain of command [Doc. 26, p. 7]. However, these cases are distinguishable because in all these cases, the plaintiffs addressed their concerns only to their immediate supervisor, a supervisor, or management. *See Keeling v. Coffee Cnty.*, 541 F. App'x 522, 527 (6th Cir. 2013); *Burgess v. Paducah Area Transit Auth.*, 387 F. App'x 538, 545 (6th Cir. 2010); *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010); *Haynes*, 474 F.3d at 364.

contends that as Deputy Fire Chief, plaintiff was forbidden under the Ethics Code from using his position to secure any privilege or exemption for himself or others that was not authorized [*Id.* at 4]. As a result, Elizabethton argues that plaintiff's conduct involved issues that arose within the course and scope of his official duties [*Id.* at 9]. On the other hand, plaintiff argues that the impetus of his speech was to criticize the handling of a COVID-19-related investigation by the fire department, and this speech was not within the scope of his duties as Deputy Fire Chief just because it merely concerned his duties [Doc. 36, p. 8]. As a result, plaintiff argues that his criticism of the COVID-19-related investigation was the general subject matter of the speech at issue and was not within the scope of his duties as Deputy Fire Chief [*Id.* at 9].

In the Amended Complaint, plaintiff has alleged that about a week after his first meeting with Carrier, Estes, and Lyons, he criticized defendants' investigation into his alleged wrongdoings [Doc. 24 ¶ 28]. Plaintiff alleges that this criticism forms part of the reason why Elizabethton constructively discharged him in violation of his First and Fourteenth Amendment rights [*Id.* ¶ 46]. This part of plaintiff's speech is arguably speech made as a private citizen and protected by the First Amendment. *See Wells ex rel. Bankr. Est. of Arnone-Doran v. City of Grosse Pointe Farms*, 581 F. App'x 469, 474–75 (6th Cir. 2014) (construing the plaintiff's statements that the defendant reported to her employer as threats to be statements protected by First Amendment retaliation law).

18

Plaintiff has further alleged that he was constructively discharged when he denied using his position to obtain vaccinations for his wife and son [Doc. 24 ¶ 46]. This part of plaintiff's speech could arguably be speech made pursuant to his official duties. However, it is worth noting that just because plaintiff's speech merely concerned his duties does not automatically transform his speech into employee speech. *See Lane*, 573 U.S. at 240. Accordingly, at the motion to dismiss stage, plaintiff's allegations give rise to the inference that the impetus and general subject matter of his speech, i.e., his responses to the investigation into his behavior regarding the COVID-19 vaccines, are factors that weigh in favor of finding that his speech was made as a private citizen.

Construing the Amended Complaint in a light most favorable to plaintiff, the Court finds that at this stage of the proceeding, plaintiff has pled sufficient factual content that allows the Court to draw the reasonable inference that plaintiff's speech was made as a private citizen rather than pursuant to his official duties. The Court will next address whether plaintiff's speech was a matter of public concern. In making this determination, courts are instructed to look at the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). "Speech touching on public concern includes speech on 'any matter of political, social, or other concern to the community.'" *Handy-Clay*, 695 F.3d at 543 (quoting *Connick*, 461 U.S. at 146).

The motivation for the speech is not relevant to the inquiry; instead, courts should focus on the content of the speech itself. *Id.* at 543–44. However, evidence proving the

19

truth of the speech is not required. *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 576 (6th Cir. 1997). In addition, it is irrelevant that the communication was not made in public, so long as the speech is on a matter of public concern. *See Handy-Clay*, 695 F.3d at 544 (finding that communications to individuals outside the plaintiff's department were related to issues of public concern even though they were expressed in private conversations).

The Court takes issue with Elizabethton's argument that plaintiff's speech cannot be on a matter of public concern because it was not made in a public arena [Doc. 40, pp. 2–3]. As the Supreme Court and the Sixth Circuit have held, it does not matter that plaintiff's speech was not made in public, so long as it is on a matter of public concern. *See Connick*, 461 U.S. at 146; *Handy-Clay*, 695 F.3d at 544; *Chappel*, 131 F.3d at 579. The more novel question in this case, however, is whether the investigation of a fire department employee regarding the misuse of his position to obtain COVID-19 vaccines for his wife and son is a matter of public concern.

While this is not the typical case where an employee exposes a department for corruption, misuse of public funds, violation of state law, or discrimination, *see Boulton v. Swanson*, 795 F.3d 526, 532 (6th Cir. 2015), plaintiff's allegations give rise to the inference that his remarks concerned more than an investigation into his conduct as Deputy Fire Chief. At the heart of this case is the COVID-19 mass vaccination event in Carter County that led to the investigation of plaintiff's actions. Although plaintiff's speech was motivated by defendants' accusations that he had improperly used his authority to obtain a

20

benefit for others, the content of his speech was the denial of plaintiff using his position to obtain COVID-19 vaccines for his family members and the criticism of the manner in which the fire department handled the investigation into these allegations.

The Court notes Elizabethton's citation to *Connick*, 461 U.S. at 149, for the proposition that because plaintiff's speech is nothing more than "an employment grievance," his speech is not entitled to First Amendment protections [Doc. 26, p. 11]. However, a circumstance is present in this case that was not present in *Connick*: the COVID-19 pandemic. In the current year of 2023, COVID-19 vaccines are readily available to members of the public, so disputes as to the distribution of the vaccine may not seem as much of a public concern. However, the underlying events in this case took place in the years 2020 and 2021, a time when COVID-19 vaccines were not readily available to everyone, and the future availability of vaccines was uncertain. In such a time of uncertainty, the Court cannot avoid the possibility that the public would have been concerned as to how employers were investigating employees accused of wrongdoing in connection to the vaccines. *See Beckerich v. St. Elizabeth Med. Ctr.*, 563 F. Supp. 3d 633, 647 (E.D. Ky. 2021) (stating that "the COVID-19 pandemic has become unfortunately political and vitriolic, on all sides"). As a result, construing the Amended Complaint in a light most favorable to plaintiff, plaintiff's allegations as to the content of his speech along with the context in which his speech occurred gives rise to the inference that plaintiff's speech was a matter of public concern.

21

Because Elizabethton has raised arguments only as to these two elements of plaintiff's claim, the Court need not undertake an analysis of the other elements. In addition, plaintiff's claim for violation of his First Amendment freedom of expressive association is analyzed under the same standard as his freedom of speech claim. *See Akers v. McGinnis*, 352 F.3d 1030, 1036 (6th Cir. 2003) (citing *Boals v. Gray*, 775 F.2d 686, 692 (6th Cir. 1985)). As a result, Elizabethton's motion [Doc. 25] is **DENIED** as to plaintiff's claims for violation of his First Amendment rights of freedom of speech and expressive association.

### 3. Fourteenth Amendment: Freedom of Association Rights with Close Family Members

Elizabethton first argues that plaintiff's claim that his constructive discharge was a violation of procedural due process is unsupported because plaintiff has failed to allege that he had a property right in continued employment [Doc. 26, pp. 11–12]. Plaintiff has not responded to this argument, and the Court is unable to discern a procedural due process claim from the Amended Complaint [Doc. 24]. However, to the extent that plaintiff has alleged that his constructive discharge was a violation of procedural due process, Elizabethton's motion [Doc. 25] is **GRANTED**.

Turning to substantive due process, Elizabethton argues that plaintiff has failed to state a claim upon which relief can be granted for interference with family association [Doc. 26, p. 13]. Elizabethton begins by stating that there are two types of freedom of association protected by the Constitution: freedom of association related to privacy under

22

the due process clause and freedom of association as a means to free speech [*Id.* at 15]. As to the latter, Elizabethton incorporated its earlier argument that plaintiff did not engage in constitutionally protected speech, and his criticism of the investigation of his potential violation of the Ethics Policy is not speech protected by the First Amendment [*Id.* at 16–17]. Because the Court has already found, *supra*, that plaintiff has stated a claim for violation of his First Amendment freedom of expressive association, the Court will not reanalyze this issue.

As to the other type of freedom of association, Elizabethton argues that although plaintiff may deny the legitimacy of the accusations lodged against him, his allegation that adverse action was taken against him for denying the accusations and criticizing defendants for their investigation do not form an appropriate factual basis for an interference with family association claim [*Id.* at 18]. Instead, Elizabethton argues that the common fact pattern for this type of claim involves a child being physically removed from a home, or the parents otherwise being restricted from retrieving the child from another's temporary custody or care [*Id.* at 16]. Elizabethton contends that because this fact pattern is not present in this case, plaintiff's family association claim is not viable [*Id.* at 18].

Plaintiff responds that his claims for violations of his freedom of association with close family members under the First and Fourteenth Amendments are plausible [Doc. 36, p. 13]. Plaintiff states that he has pleaded that Elizabethton retaliated against him for his close, personal relationships by demoting him to a much lower paying position and forcing

23

him to retire after he criticized the investigation into his wife and son obtaining COVID-19 vaccines [*Id.* at 15]. In addition, plaintiff contends that Elizabethton knew that his wife and son depended on his salary as Deputy Fire Chief to maintain their quality of life and that plaintiff would be forced to try to provide for them using his limited retirement payments in the same way. Moreover, plaintiff argues that Elizabethton's actions interfered with his right to raise and provide for his mentally disabled son because instead of being able to choose the retirement plan that afforded him the option of taking a reduced retirement payment each month until his death, at which point plaintiff's son would receive the same payment each month until his death, plaintiff was forced to choose the option of receiving the full retirement payment each month in order to pay his bills [*Id.*].

Plaintiff contends that Elizabethton's policy of retaliating against employees for their associations and criticisms constituted a direct and substantial interference with his close relationships with his wife and son, and as a result, strict scrutiny applies [*Id.*]. However, plaintiff contends that Elizabethton has not asserted that the actions taken against him furthered any rational basis, much less a substantial governmental interest [*Id.* at 15–16].

As the parties have stated, the Supreme Court has delineated two types of freedom of association claims. *See Roberts v. United States Jaycees*, 468 U.S. 609, 617 (1984). The first type is "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the

24

exercise of religion." *Id.* at 618. As the Court has already explained, this claim was addressed in Part II.B.2 and will not be repeated in this portion of the opinion.

The second type of freedom of association claim safeguards the "choices to enter into and maintain certain intimate human relationships . . . against undue intrusion by the State because of the role of such relationships[.]" *Id.* at 617–18. This type of association includes associations within family life and is protected under the Due Process Clause of the Fourteenth Amendment. *See Akers*, 352 F.3d at 1035; *Corrigan v. City of Newaygo*, 55 F.3d 1211, 1214–15 (6th Cir. 1995).

The Court disagrees with Elizabethton's argument that plaintiff's claim for violation of his freedom of intimate association fails because it does not follow a specific fact pattern. Elizabethton has identified a line of cases addressing freedom of intimate association claims based on a child being physically removed from a home, or the parents otherwise being restricted from retrieving the child from another's temporary custody or care. *See, e.g.*, *Kolley v. Adult Protective Servs.*, 725 F.3d 581, 587 (6th Cir. 2013). However, Elizabethton has not addressed the line of cases involving freedom of association claims in the context of adverse action being taken against employees because they exercised their right to intimate association. For these types of claims, "courts have analyzed the claim under first amendment retaliation jurisprudence." *Hartwell v. Houghton Lake Cmty. Schs.*, No. 17-cv-10678, 2018 WL 925848, at *10 (E.D. Mich. Feb. 16, 2018); *see Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 414–15 (6th Cir. 2011) (summarizing similar

25

cases).[4]  For example, in *Hartwell*, the court undertook analysis of the plaintiff's claim that her termination from her employment unduly interfered with her right to associate with her husband and stepchildren.  *Id.* at \*18.

In addition, the court in *Hartwell* undertook a separate analysis of the plaintiff's claim that her employer's actions interfered with her right to associate with her stepchildren, regardless of her termination.  2018 WL 925848, at \*11, 13–14.  "[W]here a plaintiff challenges government conduct that restricts the exercise of their associational rights, courts analyze the claim under the 'direct and substantial' interference test."  *Id.* at \*11 (citing *Beecham v. Henderson Cnty.*, 422 F.3d 372, 376 (6th Cir. 2005)).

Here, plaintiff has alleged in his Amended Complaint that "[d]efendants' adverse actions were taken to interfere with *and* retaliate against [him] for his close relationships with his wife and son because [they] had received their COVID-19 vaccines" [Doc. 24, ¶ 48] (emphasis added).  In addition, plaintiff's wife and son form part of his family and are included within the "certain intimate human relationships" that the freedom

---

[4]  The *Hartwell* court noted that courts are not consistent on whether the right to familial association is grounded in the First or Fourteenth Amendment but stated that the same analysis applies regardless of the constitutional provision underlying the claim.  2018 WL 925848, at \*9–10.  Recent Sixth Circuit authority has clarified that freedom of intimate association claims are better considered due process claims arising under the Fourteenth Amendment.  *Kolley*, 725 F.3d at 587.  Regardless, courts have consistently analyzed a claim for freedom of intimate association as it was first recognized and defined in *Roberts*, 468 U.S. at 618–19.  *See Gaspers*, 648 F.3d at 414; *Hartwell*, 2018 WL 925848, at \*9.  Here, plaintiff has argued that his freedom of intimate association claim is based on the Due Process Clause of the Fourteenth Amendment as recognized in *Roberts*, 468 U.S. at 618–19 [Doc. 24, ¶ 47; Doc. 36, pp. 13–16].  Based on Sixth Circuit jurisprudence, the Court finds that whether plaintiff's claim is asserted on First or Fourteenth Amendment grounds does not impact the overall analysis, so long as the claim is based on the same freedom of intimate association right recognized in *Roberts*, 468 U.S. at 618–19.

26

of intimate association is meant to protect.  *See Roberts*, 468 U.S. at 617–21; *Corrigan*, 55 F.3d at 1214–15.  Thus, accepting plaintiff's allegations as true, plaintiff has pled sufficient factual content to give rise to the inference that Elizabethton's actions violated his freedom of intimate association under the Fourteenth Amendment Due Process Clause.[5]  As a result, Elizabethton's motion [Doc. 25] is **DENIED** as to this claim.

### 4.      Retaliation and Interference Pursuant to 29 U.S.C. § 1140

In Elizabethton's motion, it argues that plaintiff's claim for interference or retaliation in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, should be dismissed because plaintiff has failed to allege that Elizabethton demoted or forced him to retire with the specific intent of avoiding ERISA liability [Doc. 26, pp. 18–21].  Plaintiff responds by arguing that defendants purposefully demoted him to Fire Marshal and forced him to retire to negatively impact the amount he would earn in retirement [Doc. 36, pp. 16–19].  In its reply, Elizabethton argues that because it is a political subdivision of the State of Tennessee, its employee benefit plan is a governmental plan that is exempted under 29 U.S.C. § 1003(b) from plaintiff's ERISA claim [Doc. 40, pp. 3–4].  Elizabethton invited plaintiff to file a surreply in response to this new argument and argues that it would be error for the Court to ignore controlling statutory law on this issue [*Id.* at 4 n.1].

---

[5] The Court notes that there is much more to plaintiff's claim that will need to be addressed before plaintiff can ultimately be successful on this claim.  *See Hartwell*, 2018 WL 925848, at *13–22.  However, because Elizabethton limited its argument to the fact that plaintiff's claim fails because it does not follow a specific fact pattern, the Court need not address the other elements or components of plaintiff's claim at this stage of the proceeding.

27

Normally, "a movant cannot raise new issues for the first time in a reply brief because consideration of such issues deprives the non-moving party of its opportunity to address the new arguments." *Malin v. JPMorgan*, 860 F. Supp. 2d 574, 577 (E.D. Tenn. 2012) (internal quotation marks omitted). However, to promote judicial efficiency and fairness, the Court ordered plaintiff to file a surreply to Elizabethton's reply within 30 days [Doc. 42]. Although the Court gave plaintiff an opportunity to respond to this newly raised argument, plaintiff did not file a surreply. As a result, the Court finds that considering the new argument raised by Elizabethton in its reply would not deprive plaintiff of his opportunity to address the argument.

Plaintiff has alleged that Elizabethton retaliated against him and interfered with his legally protected wages and benefits in violation of 29 U.S.C. § 1140 [Doc. 24, ¶ 51]. Section 1140 is part of the ERISA statutory scheme and protects participants and beneficiaries from interference with their protected rights under an employee benefit plan. 29 U.S.C. § 1140. Section 1003 excepts certain plans from ERISA's protections, including governmental plans. 29 U.S.C. § 1003(b)(1). Section 1002 defines "governmental plan" to mean "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C. § 1002(32).

The Sixth Circuit has stated that the fact "[t]hat a city is a political subdivision of a state is so undisputable that many courts have not even involved themselves in the trivial task of analyzing why." *Halttunen v. City of Livonia*, 664 F. App'x 510, 512

28

(6th Cir. 2016). The *Halttunen* court confirmed that the plaintiff's pension plan, which was established and maintained by the City of Livonia, Michigan, was a governmental plan excluded from the scope of ERISA. *Id.* at 512–13. Similarly, district courts in Tennessee have found that Tennessee city and county programs are governmental programs exempt from ERISA. *See Hilton v. Brownsville-Haywood Cnty. Chamber of Com.*, No. 1:20-cv-01092, 2020 WL 5800755, at *2 (W.D. Tenn. Sept. 28, 2020); *Rayford v. Standard Ins. Co.*, No. 08-2144, 2010 WL 890947, at *1 (W.D. Tenn. Mar. 10, 2010).

Here, plaintiff alleged that "[d]efendant City of Elizabethton, Tennessee is a municipality located within Carter County, Tennessee" [Doc. 24 ¶ 2]. In addition, plaintiff alleged that he was employed by Elizabethton as Deputy Chief of the fire department [*Id.* ¶ 7]. As a result, plaintiff's retirement plan, which was offered through Elizabethton, was a governmental plan within the meaning of ERISA and is exempt from ERISA's protections. Plaintiff has failed to direct the Court's attention to authority stating otherwise. Therefore, Elizabethton's motion [Doc. 25] is **GRANTED** as to plaintiff's ERISA claim under 29 U.S.C. § 1140.

### 5. Common Law Retaliatory Discharge

Plaintiff has asserted a claim for common law retaliatory discharge against Elizabethton only [Doc. 24 ¶ 52]. Elizabethton argues that plaintiff has failed to state a claim for relief for retaliatory discharge because a public entity cannot be sued for retaliatory discharge under common law [Doc. 25, p. 1; Doc. 26, p. 3]. In his response, plaintiff concedes that a common law retaliatory discharge claim is available only to private

29

sector employees [Doc. 36, p. 3]. In light of the fact that plaintiff concedes that he has not stated a claim for common law retaliatory discharge and agrees this claim should be dismissed, Elizabethton's motion [Doc. 25] is **GRANTED** as to plaintiff's claim for common law retaliatory discharge.

## III.    Estes and Carrier's Motion for Summary Judgment

Because Elizabethton's motion did not dispose of all plaintiff's claims, the Court must undertake a separate analysis of plaintiff's remaining claims against Estes and Carrier and will now address their alternative motion for summary judgment [Doc. 27].

### A.    Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). As such, the moving party has the burden of conclusively showing the lack of any genuine issue of material fact. *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979). To successfully oppose a motion for summary judgment, "[t]he non-moving party . . . must present sufficient evidence from which a jury could reasonably find for [it]." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

In contrast to the Court's analysis of Elizabethton's motion to dismiss [Doc. 25], the Court will no longer accept all well-pled factual allegations in the Amended Complaint as true. Instead, the Court will look to the evidence submitted by the parties to decide if there is no genuine dispute of material fact and if defendants[6] are entitled to judgment as a matter of law. The Court will incorporate its review of the evidence submitted within its analysis of the parties' arguments [*See* Docs. 28-1, 28-2, 28-3, 28-4, 37-1].

## B.    Analysis

### 1.    Carrier as a Final Decisionmaker

Defendants argue that they are entitled to summary judgment on the basis of qualified immunity [Doc. 28, p. 2]. Carrier argues that he is entitled to summary judgment because he was not a final decisionmaker for any employment decisions regarding plaintiff [*Id.* at 3–4, 7]. Instead, Carrier argues that Estes was the sole decisionmaker in the decision to terminate plaintiff [*Id.* at 11]. Carrier begins by citing to Elizabethton's Municipal Code and Tenn. Code Ann. §§ 6-35-402 and -203 to demonstrate that the power to demote or terminate an employee is vested with the City Manager [*Id.* at 7–8; Doc. 28-3, pp. 17–18; Doc. 28-4]. Carrier then cites to Estes's declaration to explain how and why Estes made the final decision to terminate plaintiff [Doc. 28, pp. 8–11; Doc. 28-2]. Estes testified that after Carrier reported his concerns about plaintiff, including what Carrier viewed as a blackmail threat, Estes interpreted the report as unacceptable conduct and a potential terminable offense [Doc. 28-2 ¶ 12].

---

[6] For this portion of the opinion, "defendants" refers to Estes and Carrier, collectively.

Based on his normal practice before making a disciplinary employment decision, Estes arranged the meeting with plaintiff, Carrier, and Lyons that took place on February 22, 2021 [*Id.* ¶¶ 13–14]. After recounting the alleged threat, Estes testified that plaintiff stated he in no way intended the statement as a threat, but when Estes challenged plaintiff's statement as a threat, plaintiff shrugged his shoulders and acquiesced [*Id.* ¶ 14]. After this meeting, Estes concluded that he did not have sufficient information or non-conflicting evidence to take disciplinary action against plaintiff based on the COVID-19 vaccine issue [*Id.* ¶ 15]. However, after discussing the possibility of retirement with plaintiff, Estes testified that absent plaintiff's willingness to retire, he was prepared to fire him for the best interest of the fire department [*Id.* ¶ 16].

Carrier first argues that whether Estes's decision to discharge plaintiff was a correct or prudent one is irrelevant to the analysis of plaintiff's constitutional claim [Doc. 28, pp. 11–12]. Carrier next contends that due to Estes's independent review of plaintiff's alleged threat to Carrier, Carrier is entitled to summary judgment under the first prong of qualified immunity [*Id.* at 12]. In the alternative, Carrier argues that he is entitled to summary judgment on the second prong of qualified immunity because no clearly established law exists that would have placed Carrier on notice that he could be held liable for an employment decision where the decisionmaker conducts his own investigation [*Id.*].

Plaintiff responds that whether Carrier was a final decisionmaker for employment decisions relating to plaintiff is irrelevant for purposes of determining qualified immunity [Doc. 37, p. 12]. Plaintiff argues that making false accusations against an employee, which

32

ultimately results in the employee's termination, constitutes an adverse action for purposes of a retaliation claim [*Id.* at 13]. Plaintiff testified in his declaration that in response to his criticism of the COVID-19 vaccine investigation, Carrier retaliated against plaintiff by falsely accusing him of threatening Carrier [Doc. 37-1 ¶¶ 24–28]. Carrier's report led to a disciplinary meeting between plaintiff, Estes, Carrier, and Lyons on February 22, 2021, where plaintiff was ultimately demoted to Fire Marshal and forced to retire or lose a substantial portion of his retirement benefits [*Id.* ¶¶ 24–39].

In the alternative, plaintiff argues that Carrier was a final decisionmaker for purposes of qualified immunity [Doc. 37, p. 14]. He argues that although Tenn. Code Ann. § 6-35-402 provides that Estes has the power to take personnel actions against fire department employees, the record indicates that Estes authorized Carrier to make those decisions relating to employees of the fire department [*Id.* at 15; Doc. 28-1 ¶¶ 4, 16, 18; Doc. 37-1 ¶ 3]. Given that Carrier contends that Estes was the sole decisionmaker in the decisions regarding plaintiff's employment, plaintiff argues that a genuine dispute of material fact exists as to whether Carrier was a final decisionmaker based on the evidence in the record [Doc. 37, p. 15].

Carrier replies that nothing in the evidence cited by plaintiff demonstrates that Carrier was a final decisionmaker, and instead, the record demonstrates that Estes was the sole decisionmaker in the employment decisions regarding plaintiff [Doc. 41, p. 2; Doc. 28-2 ¶ 13; Doc. 28-3, pp. 17–18].

33

"Public officials [] are eligible for qualified immunity if (1) they did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not clearly established at the time of the alleged misconduct." *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016) (internal quotation marks omitted). Carrier challenges the first prong of this test by arguing that because he was not a final decisionmaker in the employment decisions regarding plaintiff, he has not violated plaintiff's constitutional rights. In the alternative, he challenges the second prong by arguing that no clearly established law exists that would have placed him on notice that he could be held liable for an employment decision where the decisionmaker conducts his own investigation.

In *Stockdale v. Helper*, the Sixth Circuit stated that "when it comes to retaliation claims and the liability of decision makers versus non-decision makers[,]" the fact that the defendant did not have authority to make employment decisions regarding the plaintiff is important to the analysis for qualified immunity. 979 F.3d 498, 507 (6th Cir. 2020). The court noted that even if the defendant sets an employment decision in motion, she cannot be held liable for the decision if she had no power to make it. *Stockdale*, 979 F.3d at 507 (citing *Shehee v. Luttrell*, 199 F.3d 295, 301 (6th Cir. 1999)). In addition, the court in *Shehee* stated that where the plaintiff complains of harassment by way of fabricated claims reported to his employer, the claim does not implicate the plaintiff's First Amendment rights and is more properly characterized as a substantive due process claim of abuse of authority. 199 F.3d at 301.

34

Here, plaintiff argues that Carrier retaliated against him for criticizing the COVID-19 vaccine investigation by falsely accusing him of blackmailing Carrier, which led to plaintiff's demotion and forced retirement. However, plaintiff's claim that Carrier falsely accused him of making threats is similar to the plaintiff's allegation of fabricated claims made by the defendants in *Shehee*. *Id*. As a result, plaintiff's allegation against Carrier for retaliation in the form of false reports of threats does not implicate plaintiff's First Amendment rights and is better suited for a substantive due process claim of abuse of authority, which plaintiff has not asserted. *See id.*

In the alternative, however, plaintiff argues that Carrier was a final decisionmaker in employment decisions relating to fire department employees, including plaintiff. Plaintiff cites to Carrier's declaration to demonstrate that Carrier's prior decisions relating to the promotion of fire department employees, including plaintiff, is evidence that Estes authorized Carrier to make those decisions relating to fire department employees [Doc. 28-1 ¶ 4]. In addition, he cites to Carrier's statements to Estes about plaintiff's behavior, and his advice that plaintiff should be terminated for making threats [*Id.* ¶¶ 16–18].

Despite Carrier's decisions regarding promotions, plaintiff has not provided the Court with evidence that Carrier was authorized to make the employment decisions relating to plaintiff when he was demoted and forced to retire. Under Elizabethton's Municipal Code and Tenn. Code Ann. § 6-35-402, Estes, as the City Manager, had the discretion to

authorize Carrier to take such action regarding subordinates [Doc. 28-4], but nothing in the record demonstrates that Estes authorized Carrier to make the employment decisions of which plaintiff complains, i.e., demotion and forced retirement. Instead, the record demonstrates that Estes was the only one who had the authority to make employment decisions regarding plaintiff, and Estes alone was the one who decided to take the adverse employment actions against plaintiff [Doc. 28-2 ¶¶ 13, 16; Doc. 28-3, p. 17; Doc. 28-4]. *See* Tenn. Code Ann. § 6-35-402.

Moreover, the fact that Carrier's statements may have set in motion Estes's employment decisions regarding plaintiff is irrelevant for purposes of First Amendment retaliation where Carrier himself had no power to make the decisions. *See Stockdale*, 979 F.3d at 507 (stating that "[i]nstigating a firing by another is debatable territory").[7] As a result, the Court finds that Carrier did not make the decision to take adverse employment action against plaintiff, and plaintiff's claims against Carrier are more properly characterized as a substantive due process claim of abuse of authority, which plaintiff has not alleged. Therefore, defendants' motion for summary judgment [Doc. 27] is

---

[7] Plaintiff relies on *Paige v. Coyner*, 614 F.3d 273, 281 (6th Cir. 2010), for the proposition that making false accusations against an employee, which ultimately results in the employee's termination, constitutes an adverse action for purposes of a retaliation claim [Doc. 37, p. 13]. *See also Wells*, 581 F. App'x at 475 (finding that reports of threats to the plaintiff's employer was a foreseeable consequence of her termination and saddled the defendant with the violation of her First Amendment rights). While the Court notes the Sixth Circuit's findings in *Paige* and *Wells*, the Court cannot ignore the Sixth Circuit's more recent decision in *Stockdale*, which leads to the opposite conclusions reached herein. 979 F.3d at 507 (citing *Shehee*, 199 F.3d at 301).

36

**GRANTED** to the extent that Carrier is entitled to qualified immunity from plaintiff's remaining claims.[8]

### 2. First Amendment Claims

Seeing that Carrier is entitled to qualified immunity, the Court will address the rest of the arguments in defendants' motion [Doc. 27] only as they relate to Estes's entitlement to qualified immunity. Estes first argues that he has not violated plaintiff's First Amendment rights for the same reasons stated in Elizabethton's motion to dismiss [Doc. 25; Doc. 28, p. 14]. However, the Court has already determined, *supra*, that plaintiff has stated a claim for retaliation under the First Amendment. As a result, and in the absence of any further evidence or argument submitted by Estes as to this issue, Estes is not entitled summary judgment on the first prong of qualified immunity.

In the alternative, Estes argues that he is entitled to summary judgment on the second prong of qualified immunity because the evidence supports a finding that he could have believed that he was entitled to take adverse employment action against plaintiff because he was an employee at will and he had not engaged in speech protected by the First Amendment [Doc. 28, p. 14].

Plaintiff responds that the relevant case law concerning First Amendment retaliation against a public employee speaking as a private citizen on a matter of public concern was

---

[8] The Court reaches this conclusion as to plaintiff's First Amendment claims for freedom of speech and expressive association and his Fourteenth Amendment claim for freedom of intimate association. *See Akers*, 352 F.3d at 1036; *Shehee*, 199 F.3d at 301; *Hartwell*, 2018 WL 925848, at *10.

37

clearly established at the time he criticized defendants' investigation into the allegedly wrongfully-obtained COVID-19 vaccinations [Doc. 37, p. 18].  Thus, plaintiff contends that Estes was on notice that he could not retaliate against plaintiff for attempting to bring to light potential governmental inefficiencies and/or misconduct relating to the COVID-19 investigation, which was reported to Carrier, Estes, and Lyons, and was a matter of public concern [*Id.* at 18–19].

Plaintiff further argues that Estes's conduct was not objectively reasonable [*Id.* at 19–20].  He states that Estes made no efforts to determine the truthfulness of the allegations regarding the COVID-19 vaccinations, and when plaintiff was critical of this fact, Estes accused him of blackmailing Carrier, demoted him, and forced him to retire [*Id.* at 19].  As a result, plaintiff maintains that multiple disputes of material fact exist as to whether Estes's actions were objectively reasonable, and summary judgment should be denied [*Id.*].

Plaintiff also argues that Estes has failed to address plaintiff's First Amendment freedom of association claim, and thus, no analysis of this claim is necessary.  However, he states that because claims of freedom of association are analyzed under the same standards for freedom of speech claims, plaintiff refers the Court to his same arguments made with regards to his freedom of speech claim to show that Estes is not entitled to qualified immunity on his freedom of association claim [*Id.*].

Estes replies that considering Elizabethton's Ethics Policy, Estes had a legitimate basis for investigating the misconduct of plaintiff and any resulting violations of

Elizabethton's Ethics Policy [Doc. 41, p. 3; Doc. 28-3, p. 25]. Concerning the potential violation of the Ethics Policy, Estes contends that it remains undisputed that plaintiff attended the COVID-19 vaccine planning session as the sole representative of Elizabethton and engaged in discussions with those making the arrangements for scheduling COVID-19 vaccines to first responders [Doc. 41, p. 3; Doc. 28-1 ¶ 7; Doc. 37-1 ¶¶ 5–11]. Estes states that it is also undisputed that other firemen observed plaintiff's wife and son obtaining vaccines at a time they knew first responders were the exclusive eligible participants [Doc. 41, pp. 3–4; Doc. 28-1 ¶ 8; Doc. 28-2 ¶ 6].

Estes further contends that plaintiff has failed to address the fact that the discussion regarding the blackmail threat/insubordination took place before Estes, i.e., the decisionmaker for Elizabethton [Doc. 41, p. 4]. Estes states that he was not only capable of observing the demeanor, responses, and credibility of both Carrier and plaintiff, but Estes was entitled to do so and had a duty to make an employment decision that he considers to be in the best interest of Elizabethton's organization [*Id.* at 4–5]. Estes testified that plaintiff's termination from the fire department would be in the best interest of Elizabethton because he "considered these developments [in] achieving [plaintiff]'s departure without fanfare to be in the best interest of the Fire Department. Absent [plaintiff]'s willingness to depart by way of retirement, [Estes] was prepared to fire him" [*Id.* at 5; Doc. 28-2 ¶ 16]. In addition, Estes indicated, "Considering that [plaintiff] was in a position that was essential to the efficient operation of one of the City's largest and most important departments related to public safety, this [blackmail threat] was a report of

39

insubordination that was unacceptable conduct, perhaps even a fireable offense" [Doc. 41, p. 5; Doc. 28-2 ¶ 12].

Estes also restates his contention that plaintiff was an employee at will and could be discharged with or without cause [Doc. 41, p. 5]. Estes asserts that Tennessee has long recognized the doctrine of employment-at-will with the mutual right of either party to terminate such a relationship with or without cause, [*Id.* at 5–6]. Estes contends that plaintiff has not alleged that an independent source existed to create an expectation of employment that precluded his termination or adverse employment action [*Id.* at 6]. Estes claims that plaintiff has also not alleged the existence of a contract, implied or otherwise, that would create an independent source, and without such allegations, his claims should be dismissed [*Id.*]. Estes reiterates his contention that the judgment and prudence of his employment decision is not up for review, and as a result, without any evidence of an independent source of a property interest in employment, plaintiff's interpretation of Estes's employment decision as a constitutional violation is of no consequence [*Id.* at 6–7].

As noted earlier, "[p]ublic officials [] are eligible for qualified immunity if (1) they did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not clearly established at the time of the alleged misconduct." *Citizens in Charge*, 810 F.3d at 440 (internal quotation marks omitted). "Both inquiries are objective, as they turn on what the law is today and whether it was clearly established at the time of the challenged action."

*Id.* (internal quotation marks omitted). Having already found Estes's arguments as to the first prong unavailing, the Court will turn its attention to the second prong.

"[T]he Supreme Court has instructed that the district courts are 'not to define clearly established law at a high level of generality, . . . since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *New Century Found. v. Robertson*, 400 F. Supp. 3d 684, 703 (M.D. Tenn. 2019) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Specifically, the Supreme Court has stated:

> A Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would [have understood] that what he is doing violates that right." We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The Court will first address Estes's arguments as to plaintiff's status as an at-will employee. Estes has not provided the Court with precedent demonstrating that if a plaintiff was an at-will employee, the defendant is entitled to qualified immunity on a plaintiff's First Amendment claims. Results of independent research has only uncovered case law where a defendant was granted qualified immunity on the basis of at-will employment because the plaintiff had asserted a procedural due process claim. This results most likely because a procedural due process claim requires a plaintiff to show that he had "a constitutionally-protected property or liberty interest." *See Wells*, 581 F. App'x at 477.

41

However, a First Amendment retaliation claim requires no such showing. *See Adair*, 452 F.3d at 492.

Here, as mentioned earlier, the Court is unable to discern a procedural due process claim from the Amended Complaint. Instead, plaintiff's claims are based on the First Amendment and substantive due process [Doc. 24 ¶¶ 45–50]. As a result, without any citation by Estes, the Court is left to wonder how plaintiff's status as an employee-at-will entitles this defendant to qualified immunity on plaintiff's First Amendment claims. In Sixth Circuit cases where an at-will employee sued for First Amendment retaliation, the court simply analyzed whether the facts of the case at hand were in line with other successful First Amendment claims. *See Wells*, 581 F. App'x at 475; *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 768–69 (6th Cir. 2010). In addition, when addressing a defendant's defense of qualified immunity, the Sixth Circuit considered the plaintiff's status as an at-will employee only in regards to plaintiff's procedural due process claim but not in regards to the First Amendment retaliation claim. *See Wells*, 581 F. App'x at 476–77; *Pucci*, 628 F.3d at 765–67. As a result, Estes is not entitled to qualified immunity on plaintiff's First Amendment claims on the basis that plaintiff was an at-will employee.

The Court will now consider whether First Amendment retaliation law was clearly established at the time of the challenged action, i.e., whether Estes acted reasonably in the particular circumstances that he faced. Elizabethton's Ethics Policy states that an employee may not use or attempt to use his position to secure any privilege for himself or others

42

that is not otherwise authorized [Doc. 28-1, p. 14]. Plaintiff attended the COVID-19 vaccine meeting at the Carter County Health Department as the sole representative of Elizabethton and engaged in discussions with those making the arrangements for scheduling COVID-19 vaccines to first responders [*Id.* ¶ 7; Doc. 37-1 ¶¶ 5–11]. In addition, other firemen observed plaintiff's wife and son obtaining vaccines at a time they knew first responders were the exclusive eligible participants [Doc. 28-1 ¶ 8; Doc. 28-2 ¶ 6; Doc. 37-1 ¶ 17]. Moreover, Carrier characterized plaintiff's criticisms of the investigation into his behavior as threats and reported those alleged threats to Estes [Doc. 28-1, ¶ 18]. In the face of these allegations against plaintiff, Estes was justified as City Manager to investigate the situation [Doc. 28-3, p. 17; Doc. 28-4]. However, based on the record before the Court, there are genuine issues of material fact to discern whether Estes acted reasonably during and after the investigation.

At the meeting with Carrier, Estes, and Lyons, plaintiff testified that he denied making the alleged threat to Carrier [Doc. 37-1 ¶ 29]. In addition, Estes testified that Carrier recounted the alleged threat at the meeting [Doc. 28-2 ¶ 14], but plaintiff testified that he was not recounted the alleged threat and was not asked to explain his side of the situation [Doc. 37-1 ¶ 28]. Moreover, Estes testified that when he told plaintiff that the only way to interpret his statement was as a threat, plaintiff "acquiesced to it" by shrugging his shoulders and not disputing what Estes said [Doc. 28-2 ¶ 14]. On the other hand, plaintiff testified that when Estes told him that the only way to interpret his statement was as a threat, plaintiff said "Okay" because he had already denied making the alleged

43

threat, not because he was acquiescing or agreeing to having made the alleged threat [Doc. 37-1 ¶ 30]. Furthermore, Estes testified that his decision to terminate plaintiff was not based on the allegations in regards to the COVID-19 vaccine, and in the absence of plaintiff's willingness to retire, Estes was prepared to fire him for the best interests of the fire department [Doc. 28-2 ¶¶ 15–16]. In light of these factual disputes, the Court cannot say that there is no genuine issue of material fact as to the reasonableness of Estes's actions.

In addition, First Amendment retaliation law was clearly established at the time of the challenged action. Based on the Court's analysis in Part II.B.2 of this opinion, existing precedent at the time of Estes's actions clearly established plaintiff's First Amendment rights. Plaintiff spoke to people outside his chain of command, i.e., Lyons and Estes about a matter of public concern, i.e., investigations into the distribution of COVID-19 vaccinations, and his speech fell outside his duties as Deputy Fire Chief. *See DeCrane*, 12 F.4th at 599–600 (finding that cases at the relevant time clearly established plaintiff's First Amendment rights where he spoke outside his duties to people other than supervisors). All these circumstances taken together would have given Estes "fair warning" that his actions risked potentially violating plaintiff's First Amendment rights. *See Howard*, 2023 WL 334894, at *10; *see also Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 684 (6th Cir. 2013) (stating that "even in cases involving less than outrageous conduct, officials can still be on notice that their conduct violates established law in novel factual circumstances") (internal quotation marks omitted). As a result, Estes is not entitled to

qualified immunity on plaintiff's First Amendment claims,[9] and defendants' motion [Doc. 27] is **DENIED** on this basis.

### 3. Fourteenth Amendment Claim

Estes argues that plaintiff does not assert a viable Fourteenth Amendment claim due to the inapplicability of the common fact pattern associated with Fourteenth Amendment claims [Doc. 28, p. 18]. However, this argument has already been addressed by the Court and is unpersuasive for the reasons stated in Part II.B.3.

In the alternative, Estes argues that plaintiff's claim fails for the same reasons as his First Amendment claims, with two additional arguments [Doc. 28, p. 18]. First, Estes argues that there was no interference with plaintiff's right to raise his adult son or associate with his wife [*Id.* at 18–19]. In fact, Estes contends that plaintiff repeatedly told Estes and Carrier that he had nothing to do with the fact that his adult son and his wife were able to receive the vaccine along with first responders, and as a result, Estes was not interfering with a parental decision or plaintiff's right to associate with his wife [*Id.*; Doc. 28-1 ¶¶ 8, 11, 13, 15; Doc. 28-2 ¶ 9; Doc. 28-3 ¶ 5]. Second, Estes argues that there is no clearly established law that would have placed a reasonable city manager in Estes's position on notice that the adverse employment action as to plaintiff could violate his Fourteenth Amendment right of intimate association with his adult son or his wife [Doc. 28, pp. 18–19].

---

[9] The Court reaches this conclusion as to plaintiff's First Amendment claims for freedom of speech and expressive association. *See Akers*, 352 F.3d at 1036.

Plaintiff responds that Estes retaliated against him for criticizing the fire department's investigation by demoting him to a much lower paying position and forcing him to retire so that his wife and son, who depended on his salary to maintain their quality of life, would be forced to depend on plaintiff's limited retirement payments in the same way [Doc. 37, p. 21]. In addition, plaintiff argues that Estes intentionally interfered with plaintiff's right to raise and provide for his mentally disabled son because instead of being able to choose the retirement plan that afforded him the option of taking a reduced retirement payment each month until his death, at which point plaintiff's son would receive the same payment each month until his death, plaintiff was forced to choose the option of receiving the full retirement payment each month in order to pay his bills. Plaintiff argues that these actions constituted a direct and substantial interference with his close relationships with his son and wife [*Id.*]. In addition, plaintiff contends that Estes's actions did not further a compelling state interest, and a genuine dispute of material fact exists as to whether Estes's actions were objectively reasonable [*Id.* at 22–23]. Estes's arguments as to the reasonableness of his actions are the same as those in response to plaintiff's First Amendment claims [Doc. 41, pp. 3–7].

Plaintiff's claim for violation of his freedom of intimate association can be dissected into two parts. First, plaintiff argues that Estes retaliated against him for criticizing the fire department's investigation by demoting him to a much lower paying position and forcing him to retire, thereby affecting his ability to provide for his wife and son. This part of plaintiff's claim is analyzed under First Amendment retaliation jurisprudence. *See*

*Hartwell*, 2018 WL 925848, at *10.  Plaintiff also argues that Estes intentionally interfered with his right to raise and provide for his mentally disabled son because instead of being able to choose his retirement plan, he was forced to choose the option of receiving the full retirement payment each month.  For this part of plaintiff's claim, "courts analyze the claim under the direct and substantial interference test."  *Hartwell*, 2018 WL 925848, at *11 (internal quotation marks omitted).  Cases like *Hartwell* provided Estes fair warning that plaintiff could assert such a claim under the Fourteenth Amendment, and as a result, Estes is not entitled to qualified immunity by reason of Fourteenth Amendment freedom of intimate association law not being clearly established.  *See also Gaspers*, 648 F.3d at 414–15 (summarizing similar cases).

Having addressed the second prong of qualified immunity, the Court will turn its attention back to the first prong, i.e., whether Estes violated plaintiff's Fourteenth Amendment freedom of intimate association rights.  The Court will start with the portion of plaintiff's claim that alleges Estes retaliated against him for criticizing the fire department's investigation by demoting him to a lower paying position and forcing him to retire.  As noted, this type of claim follows First Amendment retaliation jurisprudence.  *Hartwell*, 2018 WL 925848, at *10.  In order to state a claim for retaliation under the First Amendment, a plaintiff must show:

> (1) that []he was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that

activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Adair*, 452 F.3d at 492 (internal quotation marks omitted).

Estes argues that the allegations against plaintiff regarding the COVID-19 vaccines did not form the basis for the employment decision [Doc. 28, p. 19]. He argues that his testimony is unequivocal in that he did not have sufficient information and evidence to take disciplinary action against plaintiff for that reason [*Id.*; Doc. 28-2 ¶ 15]. However, he states that he did conclude that the conflict within the fire department was best resolved by plaintiff no longer remaining employed there [Doc. 28, p. 19; Doc. 28-2 ¶ 16]. If plaintiff's theory of a violation of familial association were true, then Estes argues that virtually any city employee who was subject to disciplinary action could assert a familial association claim to the extent that all adverse employment actions likely have some tangential effect on an employee's family [Doc. 28, pp. 19–20].

In the alternative, Estes argues that even if the vaccine allegations were the basis for the employment decision, he is still entitled to qualified immunity due to the concerns by other members of the fire department that plaintiff may have improperly used his position to obtain the vaccine for his wife and adult son, in violation of the Ethics Policy [*Id.* at 20]. Estes argues that such facts would fail to support a familial association claim for the same reasons stated in Elizabethton's motion to dismiss [*Id.* at 20–21; Doc. 25]. Moreover, even if Estes took adverse employment action against plaintiff based on plaintiff's misconduct, and Estes's belief was wrong, Estes argues such facts are of no consequence to a familial

48

association claim because the allegations do not implicate privacy, freedom of association, or exercise of religion [Doc. 28, p. 21].

Estes seems to be challenging the third prong of plaintiff's claim. In the context of plaintiff's Fourteenth Amendment freedom of intimate association claim, which is analyzed under First Amendment retaliation jurisprudence, the question under this prong is whether Estes's decision was motivated, at least in part, by plaintiff's intimate associations with his wife and son because they were alleged to have received the COVID-19 vaccine by plaintiff's misuse of his position at the fire department. *See Gaspers*, 648 F.3d at 414–15 (summarizing cases where plaintiffs have alleged that adverse employment action was taken against them due to their intimate associations with others).

Estes testified that he did not have sufficient information to take disciplinary action against plaintiff relative to the allegations concerning the misuse of his position to obtain COVID-19 vaccines for his wife and son [Doc. 28-2 ¶ 15]. Instead, Estes testified that after Carrier reported plaintiff's alleged threats, Estes considered the fact that plaintiff "was in a position that was essential to the efficient operation of one of [Elizabethton's] largest and most important departments related to public safety" [*Id.* ¶ 12]. Then, Estes interpreted plaintiff's alleged threats to be "a report of insubordination that was unacceptable conduct, perhaps even a fireable offense" [*Id.*]. At the meeting with plaintiff, Estes told plaintiff that there was only one way to interpret his statement as a threat, and according to Estes, plaintiff acquiesced to Estes's characterization of his statement [*Id.* ¶ 14]. After suggesting

49

the possibility of retirement to plaintiff, Estes testified that if plaintiff was unwilling to retire, he was prepared to fire him for the best interests of the fire department [*Id.* ¶ 16].

Based on Estes's testimony, there is no genuine dispute of material fact that plaintiff's intimate associations with his wife and son, who received the COVID-19 vaccine allegedly by plaintiff's misuse of his authority, did not motivate, at least in part, Estes's adverse employment actions against plaintiff. Instead, Estes's testimony demonstrates that he took adverse action against plaintiff due to Carrier's report of plaintiff's alleged threats, plaintiff's response to those allegations, and what Estes considered a detriment to the efficient operation of the fire department [*Id.* ¶¶ 12–16]. Plaintiff has not put forth any evidence demonstrating that Estes's decision was motivated, at least in part, by his associations with his wife and son because they were alleged to have received the COVID-19 vaccine after plaintiff misused his position. As a result, no genuine dispute of material fact exists as to the third prong of the First Amendment retaliation analysis. Thus, defendants' motion [Doc. 27] is **GRANTED** to the extent that Estes is entitled to qualified immunity on plaintiff's Fourteenth Amendment freedom of intimate association claim alleging retaliation.

The Court will now address the other portion of plaintiff's Fourteenth Amendment claim alleging that Estes intentionally interfered with his right to raise and provide for his mentally disabled son. Estes argues that he did not interfere with plaintiff's right to associate with his wife, and he did not interfere with plaintiff's right to raise his adult son because he did not interfere with a parental decision. For this part of plaintiff's claim,

50

however, he has only argued that Estes interfered with plaintiff's right to associate with his son, not his wife. Specifically, plaintiff argues that as a result of Estes's actions, plaintiff was not able to choose the retirement plan that afforded him the option of taking a reduced retirement payment each month until his death, at which point his son would receive the same payment each month until his death, and plaintiff was forced to choose the option of receiving the full retirement payment each month in order to pay his bills.

This part of plaintiff's claim is analyzed under the direct and substantial interference test. *See Hartwell*, 2018 WL 925848, at *11. "Government action that constitutes a 'direct and substantial interference' with the right to associate is reviewed under strict scrutiny, whereas lesser interferences are reviewed under rational basis review." *Id.* at *13 (citing *Beecham*, 422 F.3d at 376). If plaintiff "has not been 'absolutely or largely prevented from forming intimate associations,' or 'absolutely or largely prevented from forming intimate associations with a large portion of the otherwise eligible population[,]' [his] rights have not been directly or substantially interfered with." *Id.* (citing *Beecham*, 422 F.3d at 376).

Here, plaintiff has not made any allegation that Estes's actions prevented him from associating with his son. As a result, his rights have not been directly or substantially interfered with, and Estes's actions will be reviewed under rational basis. "[R]ational-basis review is satisfied so long as there is a plausible policy reason for the decision, . . . and it is entirely irrelevant for constitutional purposes whether the plausible reason in fact motivated the policymaker[.]" *Beecham*, 422 F.3d at 378 (internal citations and quotation marks omitted).

51

Based on Estes's testimony, a plausible policy reason existed for the employment decisions regarding plaintiff. Estes was charged with the responsibility of making employment decisions regarding fire department employees [Doc. 28-2 ¶¶ 13, 16; Doc. 28-3, p. 17; Doc. 28-4]. *See* Tenn. Code Ann. § 6-35-402. Estes testified that after Carrier reported plaintiff's alleged threats, Estes considered the fact that "[plaintiff] was in a position that was essential to the efficient operation of one of [Elizabethton]'s largest and most important departments related to public safety" [Doc. 28-2 ¶ 12]. Then, Estes interpreted plaintiff's alleged threats to be "a report of insubordination that was unacceptable conduct, perhaps even a fireable offense" [*Id.*].

Thus, Estes's testimony reflects that he took employment action against plaintiff due to his concerns as to how efficiently the fire department, a department essential to public safety, would operate in the midst of the ongoing disputes between the members thereof. Estes's concerns as to the disruption in the fire department and the effect the disruption would have on public safety represent a plausible policy reason for the actions taken against plaintiff, and rational basis review is satisfied. *See Beecham*, 422 F.3d at 378 (finding a plausible policy reason where an employee's alleged actions were disruptive to the work environment). As a result, defendants' motion [Doc. 27] is **GRANTED** to the extent that Estes is entitled to qualified immunity on plaintiff's Fourteenth Amendment freedom of intimate association claim alleging an interference with the right to raise and provide for his son.

## IV.  Conclusion

Based on the foregoing, Elizabethton's motion to dismiss [Doc. 25] is **GRANTED in part and DENIED in part**.  It is **GRANTED** as to (1) any procedural due process claims plaintiff may have raised under the Fourteenth Amendment, (2) plaintiff's ERISA claim, and (3) plaintiff's claim for common law retaliatory discharge, and these claims are **DISMISSED**.  However, the motion [Doc. 25] is **DENIED** as to (1) plaintiff's First Amendment freedom of speech claim, (2) plaintiff's First Amendment freedom of expressive association claim, and (3) plaintiff's Fourteenth Amendment freedom of intimate association claim.

In addition, Estes and Carrier's motion [Doc. 27] is **GRANTED in part and DENIED in part**.  It is **GRANTED** to the extent that (1) Carrier is entitled to qualified immunity on all of plaintiff's claims, and (2) Estes is entitled to qualified immunity on plaintiff's Fourteenth Amendment freedom of intimate association claim, and these claims will be **DISMISSED**.  However, the motion [Doc. 27] is **DENIED** to the extent that Estes is not entitled to qualified immunity on plaintiff's First Amendment freedom of speech and expressive association claims.

In light of this memorandum opinion and order, the parties' Joint Motion to Stay [Doc. 43] is **DENIED as moot**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE